# Supreme Court of Florida

_____

No. SC2023-0126
_____

**ANTHONY ROJAS,**
Petitioner,

vs.

**UNIVERSITY OF FLORIDA BOARD OF TRUSTEES,**
Respondent.

July 17, 2025

PER CURIAM.

This case involves claims for breach of contract brought by Anthony Rojas, a student enrolled at the University of Florida, against the University arising from the suspension of on-campus services and the closure of on-campus facilities during the COVID-19 pandemic.  We have for review the decision of the First District Court of Appeal in *University of Florida Board of Trustees v. Rojas*, 351 So. 3d 1167 (Fla. 1st DCA 2022), which held that the claims were barred by sovereign immunity and that the University's motion to dismiss those claims should therefore be granted.  *Id.* at 1169.

Basing its holding on our seminal decision in *Pan-Am Tobacco Corp. v. Department of Corrections*, 471 So. 2d 4, 6 (Fla. 1984), in which we recognized that sovereign immunity may be waived regarding breach of contract claims but only if there is an "express, written contract[]" entered under statutory authorization, the First District held that the contract alleged by Rojas did "not constitute an express written contract sufficient to overcome sovereign immunity." *Rojas*, 351 So. 3d at 1170. We accepted jurisdiction under article V, section 3(b)(4) of the Florida Constitution based on the First District's certification of a question of great public importance.[1] Because we conclude that the First District's analysis of the requirements of *Pan-Am* is flawed, we quash the decision on review.

---

1. The First District certified as being of great public importance the following question: "WHETHER SOVEREIGN IMMUNITY BARS A BREACH OF CONTRACT CLAIM AGAINST A STATE UNIVERSITY BASED ON THE UNIVERSITY'S FAILURE TO PROVIDE ITS STUDENTS WITH ACCESS TO ON-CAMPUS SERVICES AND FACILITIES?" *Rojas*, 351 So. 3d at 1169.

## I.

We begin with the background of Rojas's claims regarding his contract with the University and the proceedings in the trial court on those claims, followed by a review of the statutory provisions relevant to the University's contracting authority.

### A.

In response to the COVID-19 pandemic, the University—along with other state universities—suspended on-campus, in-person classes and other activities and moved to online instruction. So students were told to stay away from campus during the spring and summer semesters of 2020. The crux of graduate student Rojas's complaint—which was brought as a class action—was that he and other similarly situated students were contractually required to pay mandatory fees for on-campus services that the University failed to provide while on-campus activities and operations were suspended. He also alleged that the University failed to refund the fees for services that were not provided.

The complaint alleged claims for breach of contract and for unjust enrichment. The unjust enrichment claim was dismissed by the trial court, was not at issue in the First District, and thus is not

at issue here. In support of the contract claim, Rojas attached to his complaint[2] a spring 2020 tuition statement, a general statement of tuition and various fee estimates for the 2019-2020 academic year, and a copy of the University's financial liability agreement. The allegations in the complaint focused in particular on the sums related to the activity and service fee, the transportation access fee, the health fee, and the athletics fee, which are referred to in the statement of tuition and fees attached to the complaint. No claim was made regarding tuition or room and board charges.

The core provisions of the financial liability agreement address the obligations of students:

> I agree to pay all UF debts and charges pursuant to UF policies. I understand that the university is advancing value to me in the form of educational services and that my right to register is expressly conditioned upon my agreement to pay the costs of tuition, fees, and other charges and any additional costs when those charges become due. I understand the university notifies students of debts by UF email. It is my responsibility to view my charges in ONE.UF, or at the location designated by my academic program.

---

2. Florida Rule of Civil Procedure 1.130(a) requires that material portions of a contract be incorporated or attached to a complaint brought on a contract.

The agreement goes on to detail various other terms regarding student liability, including liability for "all costs of collecting unpaid charges, including a percentage based third-party collection fee up to 30%, reasonable attorney's fees, and court costs the university may incur in efforts of collecting my account."

The trial court denied the University's motion to dismiss the contract claim, which the University based on the defense of sovereign immunity. The trial court ruled that the complaint adequately pleaded the existence of an express contract providing for the payment of fees "in exchange for specific services to be provided by UF during the Spring 2020 and Summer 2020 semesters" in accordance with the statutory authorization of student fees.

## B.

We turn now to a brief summary of some salient features of the statutory provisions that provide the backdrop to the controversy presented by this case.

Section 1001.72(1), Florida Statutes (2019), provides that the board of trustees of each state university has the power "to contract and be contracted with, to sue and be sued." Section 1009.24,

Florida Statutes (2019), contains extensive provisions regarding state university student fees, including tuition charges. Section 1009.24(2) provides that—subject to applicable exemptions and waivers—"[a]ll students shall be charged fees."

Section 1009.24(9) specifically authorizes each university to "establish separate activity and service, health, and athletic fees" to "be collected as component parts of tuition and fees" and to "be retained by the university and paid into the separate activity and service, health, and athletic funds." Such fees are required to be established by each university on the "main campus" of the university and are permitted to be established "on any branch campus or center." § 1009.24(10)(a), (11), (12), Fla. Stat. According to section 1009.24(9), universities are permitted under specified circumstances to "transfer revenues derived from" these fees "to a university direct-support organization of the university to be used only for the purpose of paying and securing debt" on certain capital projects. The "activity and service, health, and athletic fees" are subject to certain conditions and limitations under section 1009.24(4)(d), including a general prohibition on such fees exceeding 40% of the amount of the legally established tuition. The

same subsection provides that a university may, subject to certain limitations and requirements, nonetheless exceed the 40% cap to "increase its athletic fee to defray the costs associated with changing National Collegiate Athletic Association divisions."

Section 1009.24(10)(b) specifies that "[t]he student activity and service fees shall be expended for lawful purposes to benefit the student body in general," including for "student publications and grants to duly recognized student organizations." That provision also states that "[u]nexpended funds and undisbursed funds remaining at the end of a fiscal year shall be carried over and remain in the student activity and service fund and be available for allocation and expenditure during the next fiscal year."

Section 1009.24(14)(r) authorizes universities to establish "transportation access fees." Such fees are, as provided by section 1009.24(14), within a category of fees that "shall be based on reasonable costs of services."

## II.

The First District reversed the trial court's denial of the University's motion to dismiss Rojas's breach of contract claim based on the district court's conclusion that the University had not

"entered an express written contract with Rojas that obligated it to provide specific services at a specific time in a specific way." *Rojas,* 351 So. 3d at 1172. According to the district court, "the assorted documents attached to the complaint do not constitute an express written contract sufficient to overcome sovereign immunity" and the trial court therefore erred in failing to conclude that sovereign immunity barred Rojas's contract claim. *Id.* at 1169, 1170. Relying on *Pan-Am*'s analysis of the waiver of sovereign immunity for contractual liabilities, the district court stated that "for waiver-by-contract, there must be an express, written agreement that is legislatively authorized (that is, the state entity had statutory authority to enter the contract, thereby waiving sovereign immunity and binding the State)." *Id.* at 1170. The district court then reasoned that the waiver-by-contract requirement for an express, written contract imposed on Rojas the need to identify "an express written contract expressly addressing the University's obligation to provide [the] on-campus services" that were the subject of his complaint. *Id.* at 1171.

The district court concluded that Rojas had failed "to clear this basic hurdle" but had instead submitted—in the attachments to his

- 8 -

complaint—an insufficient "hodge-podge of documents." *Id.* The court identified two specific deficiencies in the contract documents submitted in support of Rojas's contract claim. First, the court said that those documents have no "language obligating the University to provide specific, on-campus services to any student during any specific time." *Id.* Second, the court stated that none of the contract documents contained any "language that can be read to obligate the University to a refund of fees when any such services are paused, limited, or outright cancel[ed]." *Id.* The court also stated that "all that [the financial liability agreement] does is expressly condition a student's right to enroll upon that student's agreement to pay tuition, fees, and any other amounts that may come due." *Id.* Finally, responding to Rojas's contention that section 1009.24 "impos[es] 'implied conditions [into] [the University's] express contracts with its students,' " the court concluded that the statute provided no support for Rojas's contract claim because "no provision of section 1009.24 directs the University to provide a specific service or requires that a service be provided in person or on campus." *Id.* at 1171-72 (second alteration in original).

- 9 -

## III.

We now briefly summarize the arguments presented to this Court by Rojas and the University.[3]

The crux of Rojas's argument here is that the First District erred in failing to recognize that his contract with the University contains implied covenants of good faith and commercial reasonableness or fair dealing. Rojas suggests that this failure underlies the First District's identification of insufficiencies in the contract. He argues that no authority supports the view "that a party to a contract only needs to provide services in exchange for fees paid for those services if the contract expressly states so" or that a "party to a contract only needs to refund fees paid for services that were not provided if the contract expressly states so." Rojas contends that these limitations on the usual obligations of a party contracting to provide services were "created from whole cloth to extricate" the University from its contractual obligations to provide services in exchange for fees authorized under section

---

3. Both parties make additional points that we need not address in resolving this case at the motion to dismiss stage of the proceedings.

- 10 -

1009.24 and are not justified by sovereign immunity waiver-by-contract doctrine.

The University answers by arguing that Rojas "does not present any document requiring on-campus services and facilities to be provided in the Spring and Summer 2020 semesters for the fees that were paid." The University further contends generally that under section 1009.24 there is "more discretion than restriction in how the University applies each fee." Thus, according to the University, the "statute does not mandate specific services, and it does not create an express contract regarding those services." The University urges a critical distinction between the written contract it entered—which does not escape the sovereign immunity bar—and an enforceable "express, written contract that obligates the University to provide specific fee-related services at a specific time." Therefore, the University submits, the First District "correctly concluded" that Rojas "did not sufficiently plead an express contract" that would meet the waiver-by-contract requirements of *Pan-Am.*

## IV.

We now examine *Pan-Am* and its progeny.

### A.

*Pan-Am* involved a breach of contract action against the Department of Corrections brought by the operator of vending machines at state correctional facilities. 471 So. 2d at 4-5. The written contract between Pan-Am and the department provided for cancellation by the department for "unsatisfactory performance" upon the giving of specified notice and affording Pan-Am the opportunity to "correct any deficiencies." *Id.* at 4. Pan-Am sued based on the department's alleged failure to comply with the contract's notice provisions. *Id.* at 5. After the circuit court granted summary judgment for the department based on its affirmative defense of sovereign immunity, the First District affirmed but certified a question of great public importance. *Id.*

We began our analysis in *Pan-Am* by stating that "[i]n Florida, sovereign immunity is the rule, rather than the exception." *Id.* In support of this proposition, we cited the text of article X, section 13 of the Florida Constitution: "Provision may be made by general law for bringing suit against the state as to all liabilities now existing or

hereafter originating." *Id.* (quoting art. X, § 13, Fla. Const.). After mentioning that "the legislature has explicitly waived sovereign immunity in tort" by section 768.28, Florida Statutes, we observed that "[t]here is no analogous waiver in contract." *Id.* But we then explained why legislative action in general law provides the basis for waiver-by-contract. *Id.*

Such legislative action is the first of two pillars on which our analysis regarding waiver-by-contract rests. The second pillar is a basic principle of contract law. Regarding legislative action, we recognized that "the legislature has, by general law, explicitly empowered various state agencies to enter into contracts" and that the legislature "has authorized certain goals and activities which can only be achieved if state agencies have the power to contract for necessary goods and services." *Id.* Regarding contract law, we observed that "[i]t is basic hornbook law that a contract which is not mutually enforceable is an illusory contract" and that "[w]here one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound." *Id.*

- 13 -

Against the backdrop of this basic principle of contract law, we reasoned that the legislative authorization of governmental action and governmental contracting in furtherance of that action entails the enforceability of government contracts. *Id.* Because "the legislature has clearly intended" that the contracts it authorizes "be valid and binding on both parties," it therefore waives the sovereign immunity that would render them not binding on the government. *Id.* "As a matter of law"—that is, the requirement of mutual enforceability—"the state must be obligated to the private citizen or the legislative authorization for such action is void and meaningless." *Id.* The government cannot obtain the benefit of entering contracts without taking on the liability that results from breaching the government's obligations under those contracts. Enforceable rights for the government must be joined to enforceable rights for the other contracting party.

We thus held that when "the state has entered into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the state from action arising from the state's breach of that contract." *Id.* Finally, we "emphasize[d]" that our holding was "applicable only to suits on

- 14 -

express, written contracts into which the state agency has statutory authority to enter." *Id.* at 6.

**B.**

After our decision in *Pan-Am*, the district courts considered a series of cases in which the parties disputed the proper application of *Pan-Am*'s holding. In these cases, the courts grappled with the waiver-by-contract doctrine's application to various obligations connected to a contract but not explicitly stated in the text of the contract. We next examine these decisions of the district courts before turning to this Court's assessment of them, which was delivered in *County of Brevard v. Miorelli Engineering, Inc.*, 703 So. 2d 1049 (Fla. 1997).

**1.**

The first in the series of cases was *Southern Roadbuilders, Inc. v. Lee County*, 495 So. 2d 189 (Fla. 2d DCA 1986), which dealt with a dispute related to a written contract for an airport construction project that arose from a change in the scope of the construction work. *Id.* at 190. After construction had proceeded for a period, Lee County "revised the plans for underground drainage." *Id.* Months after completion of the project, Southern claimed that, in

complying with the revised plans, it had incurred several hundred thousand dollars in additional costs, which it brought suit to recover.  *Id.*  The Second District Court of Appeal upheld the trial court's application of sovereign immunity to bar the claim for breach of contract.  *Id.*

In deciding the case, the Second District rejected Southern's argument that Lee County, "in its vacillation on plans for the underground drainage[,] breached an implied contractual duty of reasonable cooperation and payment of additional costs."  *Id.*  Instead, the court accepted Lee County's argument that Southern was seeking "enforcement of a new and separate oral contract."  *Id.*  The court focused on a "job specification" that "provided procedural instructions to be followed by [Southern] in order to change the terms of the written contract."  *Id.* at 190-91.  Southern's failure to comply with the specification doomed its claim.  Southern "totally ignored [the] procedural instructions [of the specification] and failed to secure any properly executed written instrument approving changes in the contract."  *Id.* at 191.  Southern thus could not establish that "a breach of the written and binding instrument occurred."  *Id.* at 190.

**2.**

*Champagne-Webber, Inc. v. City of Fort Lauderdale*, 519 So. 2d 696 (Fla. 4th DCA 1988), addressed a written contract entered by the City for the construction of a bridge by Champagne-Webber. *Id.* at 696. When Champagne-Webber sued the City, the trial court determined that the claims against the City were barred by the defense of sovereign immunity under *Pan-Am* and *Southern Roadbuilders*, but the Fourth District Court of Appeal disagreed—except regarding a quantum meruit claim. *Id.* at 697. The claims other than quantum meruit were based on the allegation of express and implied covenants and warranties under the written contract. *Id.* Champagne-Webber's claim of breach of those covenants and warranties rested on the allegation that the City had provided "inaccurate and misleading information concerning the soil condition" at the construction site: that the soil was sand only rather than the sand and rock that were actually present. *Id.* at 696-97.

The district court concluded that the trial court had erroneously determined that those claims of breach "were founded on theories of implied contract and therefore barred by the doctrine

of sovereign immunity." *Id.* at 697. The district court held that those claims instead "were claims arising out of the express written contract between the parties, albeit those claims included allegations of breach of *implied* covenants and breach of *implied* warranties." *Id.*

The district court rejected the view—which it suggested was adopted by the *Southern Roadbuilders* court and may have influenced the trial court decision on review—that the reference in *Pan-Am* to "suits on express, written contracts" means "that no contractual cause of action may be maintained against a state agency unless it is one for breach of an *express covenant or provision* of an express written contract." *Id.* The district court pointed out *Pan-Am*'s reasoning that "the legislature, in authorizing a state agency to enter into a contract, clearly intended that such contracts be valid and binding on both parties and, thus, mutually enforceable against both." *Id.* (citing *Pan-Am*, 471 So. 2d at 5). According to the district court, "there is no indication that the [*Pan-Am*] Court intended by its decision to . . . change established principles of contract law." *Id.* And those established principles recognize the existence of "implied covenants and conditions" in

"[v]irtually every contract." *Id.* The district court cited among others the implied covenant to "perform in good faith" and "an implied obligation to furnish information which would not mislead prospective bidders." *Id.* at 697-98. Stating that its decision conflicted with *Southern Roadbuilders*, the Fourth District held that when "a suit is brought on an express, written contract entered into by a state agency under statutory authority, the defense of sovereign immunity does not protect the state agency from an action arising out of a breach of either an express or *implied covenant or condition* of that contract." *Id.* at 698 & n.2.

**3.**

Subsequently, the Fourth District in *Interamerican Engineers & Constructors Corp. v. Palm Beach County Housing Authority*, 629 So. 2d 879 (Fla. 4th DCA 1993), dealt with facts similar to the facts in *Southern Roadbuilders* but reached a different result than was reached by the Second District. After the county Housing Authority had entered a contract with Interamerican for the construction of a HUD project, Interamerican "encountered unexpected obstacles throughout the construction," including "the necessity of demucking the construction site." *Id.* at 880. Interamerican then

"sought recovery for . . . increased costs and expenses" resulting from the various unexpected obstacles. *Id.* The district court recounted that "[d]espite the contractor's failure to comply with contractual provisions requiring submissions for additional time and expenses in a prescribed manner, the Housing Authority paid some of the claims and denied others." *Id.*

In the ensuing litigation, Interamerican "maintained that the conduct between the parties had waived the contractual prerequisites" while the Housing Authority "adhered to contractual provisions to ward off the claims." *Id.* The Housing Authority "argued that the damages sought by the contractor were not expressly covered under the written contract" and that the Housing Authority thus "was immune from suit." *Id.* at 881. Interamerican contended "that as long as a written contract existed between the parties, suit could be brought on express and implied covenants of the written agreement." *Id.* The trial court ruled for the Housing Authority, but the Fourth District determined that the trial court had misinterpreted the holding in *Champagne-Webber* and had erred in concluding that Interamerican's claim was barred by the doctrine of sovereign immunity. *Id.*

After discussing the decisions in *Pan-Am*, *Southern Roadbuilders*, and *Champagne-Webber* and noting the conflict with *Southern Roadbuilders* identified in *Champagne-Webber*, the district court concluded that the trial court had erred because it apparently believed that "*Southern Roadbuilders* protected the government entity from liability." *Id.* The trial court had thus ruled—in accord with *Southern Roadbuilders*—that Interamerican's claim was barred by sovereign immunity because Interamerican "had not complied with the time deadlines or written requirements of the express contract in requesting additional time and making claims." *Id.* But the Fourth District had already said that it was not in accord with the Second District's decision in *Southern Roadbuilders*. So the *Interamerican* panel of the Fourth District did not accept the trial court's apparent line of reasoning. The Fourth District reversed and held that "[a]s long as an express written agreement exists, the basis for a breach of contract suit also exists and may include claims based upon implied covenants within the agreement"—even when those claims arise from a failure by the claimant to follow the express provisions of the written agreement. *Id.* at 881-82.

- 21 -

**4.**

In *County of Brevard v. Miorelli Engineering, Inc.*, 677 So. 2d 32 (Fla. 5th DCA 1996), *decision quashed*, 703 So. 2d 1049 (Fla. 1997), the Fifth District Court of Appeal considered a dispute related to performance under a written contract between Brevard County and Miorelli for the construction of a spring training facility for a professional baseball team. *Id.* at 33. The County terminated Miorelli as the contractor and withheld payment for the remaining funds that were due. *Id.* Miorelli then sued the County on a variety of grounds. *Id.*

Among the claims made by Miorelli was one for payment for extra work that had been performed. *Id.* Miorelli alleged breach of the implied covenant to act in good faith based on various acts and omissions by the County, including dilatory conduct on various matters. *Id.* at 34. An allegation was also made that undisclosed site conditions had resulted in additional costs. *Id.* The County raised the bar of sovereign immunity against Miorelli's claims, including the claim "for the extra work not expressly included in the terms of the written agreement." *Id.* at 33. The County contended that the claim for extra work was precluded because the "extra

work was not contemplated by the written contract and no written change orders were issued authorizing the extra work as required by the contract." *Id.* In response, Miorelli contended that the County had waived the contract provisions prohibiting modification "without written change orders" by "directing changes to the project" without following the required change order protocol. *Id.* at 34.

The Fifth District recognized *Southern Roadbuilders* as holding that "a contractor's claims for additional costs against a county would be barred by sovereign immunity where the additional costs were not addressed in the original written contract nor in any subsequent written instrument." *Id.* at 33. But the court declined to follow *Southern Roadbuilders.* Aligning instead with its understanding of the Fourth District's teaching in *Champagne-Webber* regarding implied covenants, the Fifth District held that Miorelli's "claims based on breach of the implied covenants of good faith and fair dealing"—which encompassed the claim regarding extra work—"should not be barred by sovereign immunity." *Id.* at 34. We then accepted review of the decision based on express and direct conflict with *Southern Roadbuilders.*

## C.

In our review of the Fifth District's *Miorelli* decision, we began by recounting *Pan-Am*'s recognition of the implied waiver of sovereign immunity arising from the legislative authorization of contracting by state entities. 703 So. 2d at 1050. We then discussed *Southern Roadbuilders* and *Champagne-Webber*, explaining how those two cases presented different issues, and concluding that the question in the *Miorelli* case was the same as the question in *Southern Roadbuilders*, but was "outside the parameters of *Champagne-Webber*." *Id.* at 1050-51. We explained that in *Southern Roadbuilders* the Second District concluded that "sovereign immunity barred a contractor's claim for payment for additional work where that work was not included in the original contract or any subsequent written instrument." *Id.* at 1050. We compared this with *Champagne-Webber*'s holding that "*Pan-Am* did not preclude a contractor from recovering additional expenses based on a claim of breach of implied covenants or conditions contained within the scope of an express written contract." *Id.* Regarding *Champagne-Webber*, we also observed that "the key issue was whether the city had misrepresented the soil conditions at the

construction site and whether the contractor had justifiably relied on the misrepresentation." *Id.* at 1051.

We stated that we "agree with *Champagne-Webber*'s interpretation of *Pan Am.*" *Id.* And we thus quoted favorably and at length *Champagne-Webber*'s interpretation of *Pan-Am.* *See id.* at 1050-51 (quoting *Champagne-Webber*, 519 So. 2d at 697-98). In particular, we cited that portion of the analysis that included the statement that "[v]irtually every contract contains implied covenants and conditions"—including an "implied covenant" to "perform in good faith." *Id.* at 1050 (quoting *Champagne-Webber*, 519 So. 2d at 697). We also agreed with the language in *Champagne-Webber* stating that the principles of *Pan-Am* required recognizing the waiver of sovereign immunity not "only for the state's breach of an express covenant or condition of an express, written contract" but also for "the state's breach of an implied covenant or condition of such contract." *Id.* at 1051 (quoting *Champagne-Webber*, 519 So. 2d at 698).

But we disagreed with *Champagne-Webber*'s "observation that its opinion conflicted with *Southern Roadbuilders.*" *Id.* We reasoned that "[b]inding the sovereign to the implied covenants of

an express contract" (as was approved in *Champagne-Webber*) "is quite different from requiring a sovereign to pay for work not contemplated by that contract" (as was rejected in *Southern Roadbuilders*). *Id.* We recognized that the facts in *Champagne-Webber* were materially different from the facts in *Southern Roadbuilders* and that the differing results were justified. We thus approved the rationale of both *Southern Roadbuilders* and *Champagne-Webber. Id.*

We quashed the decision of the Fifth District on review, holding that Miorelli's "extra work claims are for work totally outside the terms of the contract" and that "[w]ithout a written change order, the doctrine of sovereign immunity precludes recovery of the cost of the extra work." *Id.* In so holding, we rejected the claim by Miorelli that "the doctrines of waiver and estoppel can be used to defeat the express terms of the contract." *Id.* We concluded that allowing such a use of waiver and estoppel would negate "the requirement of *Pan Am* that there first be an express written contract before there can be a waiver of sovereign immunity." *Id.* We pointed out that application of the doctrines of waiver and estoppel would permit "[a]n unscrupulous or careless

government employee" to "alter or waive the terms of the written agreement, thereby leaving the sovereign with potentially unlimited liability." *Id.*

Finally, we disapproved the decision in *Interamerican,* which—as we have already explained—involved facts similar to *Southern Roadbuilders* but reached a different result. *Id.* Our disapproval of *Interamerican* was entailed by our decision to quash *Miorelli,* which also involved facts similar to *Southern Roadbuilders* but reached a different result.

Three salient points emerge from our decision in *Miorelli.* First, *Pan-Am*'s requirement for an express written contract does not foreclose all implied covenants and conditions that arise under contract law. Second, *Pan-Am*'s framework for waiver-by-contract—with its focus on a properly authorized written contract—does preclude implied obligations that defeat the express provisions of a contract entered by a government entity and claims for "work totally outside the terms of the contract." Third, the preclusion of implied obligations in conflict with express contractual provisions extends to obligations that would arise from application of the doctrines of waiver and estoppel. In sum, *Miorelli* recognizes a line between

impermissible implied obligations that contradict, supplant, or override express contractual provisions and permissible implied obligations that do not have such a directly antagonistic relationship with the text of a contract.

**V.**

We now evaluate the decision of the First District in *Rojas* in light of our understanding of the sovereign immunity waiver-by-contract doctrine as we have explained it in *Pan-Am* and *Miorelli*. The case comes to us on a determination by the district court that the University's affirmative defense of sovereign immunity required the dismissal of Rojas's contract claims with prejudice for failure to state a claim. "The issue of sovereign immunity in this case is a legal issue subject to a de novo standard of review." *Plancher v. UCF Athletics Ass'n*, 175 So. 3d 724, 725 n.3 (Fla. 2015). In deciding that legal issue, given the procedural posture of the case, "we must accept as true" the factual allegations of Rojas's complaint and from those allegations "we must draw all reasonable inferences in favor of" Rojas. *W.R. Townsend Contracting, Inc. v. Jensen Civ. Const., Inc.*, 728 So. 2d 297, 300 (Fla. 1st DCA 1999).

As our decision in *Miorelli* makes clear, the waiver-by-contract doctrine does not carry with it a broad prohibition on all claims based on implied covenants or conditions. On the contrary, we have recognized that—under basic principles of law—contracts include implied covenants, such as the implied covenant to "perform in good faith." *Miorelli*, 703 So. 2d at 1050 (quoting *Champagne-Webber*, 519 So. 2d at 697). But the line of reasoning adopted by the First District in *Rojas* cannot be reconciled with our recognition of permissible implied covenants. Indeed, *Rojas*'s reasoning suggests that government contracts are held to a standard that does not apply to any other contracts—not only because all implied covenants are negated, but also because a requirement is imposed for extraordinary specificity in contract terms. According to the First District, without a heightened level of specificity in its terms, a written contract is not "sufficient to overcome sovereign immunity." *Rojas*, 351 So. 3d at 1169, 1170. Nothing in our case law supports this view.

So the First District, in its interpretation of the waiver-by-contract doctrine, faults the contract documents produced by Rojas for containing no "language obligating the University to provide

- 29 -

specific, on-campus services to any student during any specific time." *Id.* at 1171.  But there is no doubt that the contract documents refer to at least some fee-associated services—e.g., transportation services—that could reasonably be understood only as services to be provided on campus.[4]  And there is no doubt that the time for the performance of the obligations under the contract documents is during the school terms specified in the documents. Aside from issues concerning the scope of the statutory authorization to contract, questions about the precise scope of the University's obligation to provide fee-associated services are questions of contract interpretation—not an issue of sovereign immunity.  *Rojas*'s reasoning on this point does not properly apply our sovereign immunity precedents on waiver-by-contract.  It does not recognize that except for the limitations we explained in *Miorelli*, properly authorized contracts with state entities are interpreted in the same way that other contracts are interpreted.

---

4.  By the use of this example, we imply nothing concerning any other category of services.

Similarly, the First District faults the contract documents because they contain no "language that can be read to obligate the University to a refund of fees when any [of the contracted] services are paused, limited, or outright cancel[ed]." *Id.* It is a basic principle of contract law that when a party contracts to receive and pays for services a remedy will ordinarily be available if the other party subsequently fails to perform. Neither the First District nor the University point to any authority contrary to this self-evident point of contract law. The waiver-by-contract doctrine provides no basis for concluding that a contract suffers from a fatal insufficiency simply because it fails to expressly state the remedies that are generally available for breach of contract. The First District misses the mark on this point.

We also reject the First District's understanding of the basic rights of students under the financial liability agreement. The First District states that "all that [the financial liability agreement] does is expressly condition a student's right to enroll upon that student's agreement to pay tuition, fees, and any other amounts that may come due." *Id.* On its face, this understanding of the contract would render the rights of students illusory. The "right to enroll"

becomes meaningless if shorn of the benefits that in the ordinary course flow from enrollment.  The waiver-by-contract doctrine does not justify such a strained interpretation of the University's contract.

Because of these errors in the First District's analysis, we conclude that its decision must be quashed.[5]  But we do not decide that the bar of sovereign immunity cannot ultimately be applied to any of the claims raised by Rojas.  That question is subject to further litigation.

Finally, in connection with what remains to be litigated, we recognize that the First District made passing conclusory comments regarding the authority concerning fees granted by section 1009.24. The parties have likewise presented nothing more than conclusory assertions regarding the scope and import of those statutory provisions.  Yet the scope and import of those provisions is of fundamental significance.  Waiver-by-contract is dependent on statutory authorization to contract and the scope of the waiver is

---

5.  Our focus on particular errors does not imply approval of other elements of the First District's analysis.

necessarily restricted by the limitations and conditions of the authorization. There can be no liability for breach of any obligation undertaken that is made in conflict with the authorization. But we have not here been presented with arguments sufficient to provide a basis for a decision regarding the scope of the authorization granted by section 1009.24. So we do not suggest that the scope of the waiver under the relevant statutory provisions either does or does not preclude claims made by Rojas in this case.

## VI.

The waiver-by-contract doctrine does not preclude claims based on the breach of implied covenants or conditions that do not conflict with express contract provisions. The First District erred in failing to recognize this point. The First District also erred in understanding that the waiver-by-contract doctrine imposes a requirement for extraordinary specificity in government contracts. There is no basis in our jurisprudence for such a requirement.

In line with our analysis here, we reframe the certified question as follows:

> For written contracts entered by government entities, does sovereign immunity bar claims for breach of implied

covenants and conditions that do not contradict,
supplant, or override express contract provisions?

We answered this question in the negative. The decision of the First District is quashed.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, and
FRANCIS, JJ., concur.
SASSO, J., dissents with an opinion, in which GROSSHANS, J.,
concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION
AND, IF FILED, DETERMINED.

SASSO, J., dissenting.

I agree with much of the majority opinion, including its synthesis of sovereign immunity law. Contrary to the First District's conclusion, the waiver-by-contract doctrine does not carry with it a broad prohibition on all claims based on implied covenants or conditions. But it does place on the plaintiff the burden to demonstrate that the alleged claim is truly one that is under, versus outside, the contract. *See, e.g., County of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1051 (Fla. 1997) (noting the "requirement of *Pan Am* that there first be an express written contract before there can be a waiver of sovereign immunity").

It appears I depart from the majority though when it comes to assessing how specific a plaintiff seeking to overcome a sovereign immunity defense must be. This is so because we know that sovereign immunity waiver presents more than a question of whether a contractual relationship exists. *See, e.g., id.* (concluding sovereign immunity barred suit even though contractual relationship existed because specific breach alleged was based on work outside of terms of contract). So the salient question is whether the plaintiff has alleged the existence of a written contract containing the terms the plaintiff alleges have been breached. *See, e.g., Halifax Hosp. Med. Ctr. v. Glob. Trauma Sys., Inc.*, 386 So. 3d 1054, 1056 (Fla. 5th DCA 2024) (consulting the written agreements between the parties to evaluate whether they contained a provision supporting the alleged breach); *City of Mia. Firefighters' & Police Officers' Ret. Tr. & Plan v. Castro*, 279 So. 3d 803, 807 (Fla. 3d DCA 2019) (noting that examining the duty imposed by the contract is critical to determining whether sovereign immunity is waived). This inquiry does result in a specific analysis. But it is the level of specificity that I believe a proper sovereign immunity waiver analysis demands. *See Levine v. Dade Cnty. Sch. Bd.*, 442 So. 2d

210, 213 (Fla. 1983) (facts for a waiver of sovereign immunity must be pled in the complaint).

To answer that question here, one first needs to evaluate the allegations in Rojas's complaint. Rojas's complaint is based on an exact premise. Rojas alleges that students "entered express contracts with [the University] for specific on-campus resources and services during the Spring and Summer 2020 terms." Rojas further alleges that students "paid [the University] fees in exchange for receiving or accessing specific on-campus resources and services" during those same terms. Rojas then alleges that the University breached this contract, specifically, when it "stopped providing services for which the fees were paid, and did not return the fees to students."

Based on these allegations, Rojas needs to demonstrate that there is a contract for (1) specific on-campus resources and services, (2) during the Spring and Summer 2020 terms, (3) that were paid for by the plaintiffs, (4) that students must receive or have access to on campus, and (5) for which they are entitled to a pro-rated refund. Rojas can accomplish this by demonstrating that

these terms either exist in the contract or are implied obligations arising out of a term that exists in the contract.

The next step is to compare the obligations Rojas alleges were breached to the alleged contract's terms.[6] This is where Rojas falters though. Rojas alleges the "contract" consists of the financial liability agreement, invoices, tuition statements, and other billing materials, as well as the University's many detailed statements about specific services to be provided in exchange for fees. The financial liability agreement, for example, provides:

> I agree to pay all [University] debts and charges pursuant to [University] policies. I understand that the university is advancing value to me in the form of educational services and that my right to register is expressly conditioned upon my agreement to pay the costs of tuition, fees, and other charges and any additional costs when those charges become due.

---

6. Because Florida requires that any contract upon which an action is based be attached to the complaint, this is an appropriate question to ask at the motion to dismiss phase. *See, e.g.*, *Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185-86 (Fla. 2020) ("[C]ourts should determine entitlement to sovereign immunity as early as the record permits."); *Lutz v. Protective Life Ins. Co.*, 951 So. 2d 884, 888 (Fla. 4th DCA 2007) (where allegations in complaint for breach of contract did not sufficiently tie the alleged contractual breaches to any specific requirement, motion for judgment on the pleadings was proper).

In other words, if you pay the fees, you get the right to enroll. That is all that is provided by the agreement. But Rojas does not allege that the University breached its obligation to let him enroll. Nor can this general duty to permit enrollment be read as creating an obligation to provide certain on-campus services or else provide students pro rata refunds based on some theory of implied covenants.[7] *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1235 (Fla. 4th DCA 2001) ("Allowing a claim for breach of the implied covenant of good faith and fair dealing 'where no enforceable executory contractual obligation' remains would add an obligation to the contract that was not negotiated by the parties." (quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998))).

Because the financial liability agreement does not get Rojas where he needs to go, Rojas's complaint next walks through a series of websites that describe the services associated with the various

---

7. This interpretation does not render the right to enroll meaningless. For example, the financial liability agreement expressly recognizes the provision of "educational services." Were the University collecting tuition and refusing to offer classes, this may be a different case.

fees.  Some of those websites describe services that occur on campus—a shuttle bus system and a student health care center, for example.  But missing from these various websites is any promise by the University to continue operating the services in the manner described, let alone anything indicating that the University is obligated to provide the services upon receipt of fee payments from students.  So even if these website provisions were incorporated into the contract, which is an argument Rojas must stretch far for, they do not contain the terms Rojas alleges the University breached.

Failing to identify a provision obligating the University to provide on-campus services or else provide pro rata refunds, Rojas falls back on allegations of "implied covenants or conditions."  This is where Rojas starts getting very general though.  He does not reveal what those implied covenants are, or from which specific contractual provision they emanate.  And, in my view, his general argument is based on a mistaken understanding of what an implied covenant is.  For example, to the extent Rojas refers to the implied covenant of good faith, that duty must "relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source

of breach when all other terms have been performed pursuant to the contract requirements." *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n*, 94 So. 3d 541, 548 (Fla. 2012) (quoting *Ins. Concepts*, 785 So. 2d at 1235); *see also Miorelli*, 703 So. 2d at 1050 ("*Pan-Am* did not preclude . . . a claim of breach of implied covenants or conditions *contained within the scope of an express written contract.*" (emphasis added)). Because the express term Rojas alleges does not exist, whether the University carried out its obligations under that term in good faith is irrelevant.

In sum, none of the documents Rojas identified evince a written contract containing the terms he alleges the University breached. And while the alleged "implied covenants" Rojas falls back on do not supplant or override express contractual provisions, they fail to relate to performance of an express term of the contract, adding obligations to the contract for which the parties did not negotiate. For this reason, I disagree with the majority's approach to reframing the certified question because it incompletely describes what sovereign immunity bars. Sovereign immunity does not bar claims for breach of implied covenants and conditions that do not supplant or override a contract *if* the implied covenants and

conditions arise out of a term in the contract. Because Rojas's claim is one that adds (as opposed to supplants or overrides) terms to a contract, it is not a claim falling within the scope of the contract. I therefore respectfully dissent from this Court's opinion.

GROSSHANS, J., concurs.

Application for Review of the Decision of the District Court of Appeal
    Direct Conflict of Decisions/Certified Great Public Importance

    First District - Case No. 1D21-3430

    (Alachua County)

Douglas F. Eaton of Eaton & Wolk, P.L., Miami, Florida,

    for Petitioner Anthony Rojas

Joseph W. Jacquot and Lauren V. Purdy of Gunster Yoakley & Stewart, P.A., Jacksonville, Florida, and Jounice Nealy-Brown of Gunster Yoakley & Stewart, P.A., Tampa, Florida,

    for Respondent University of Florida Board of Trustees

Janet R. Varnell of Varnell & Warwick, P.A., Tampa, Florida,

    for Amicus Curiae The National Association of Consumer Advocates

Petra L. Justice of Banker Lopez Gassler, P.A., Tampa, Florida; and Elaine D. Walter of Kula & Associates, P.A., Miami, Florida,

    for Amicus Curiae Florida Defense Lawyers Association

James Uthmeier, Attorney General, Jeffrey P. DeSousa, Acting Solicitor General, and Nathan A. Forrester, Chief Deputy Solicitor General, Tallahassee, Florida,

for Amicus Curiae State of Florida